## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHARLES ORGEL, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RED HAT, INC., JAMES M. WHITEHURST, NARENDRA K. GUPTA, SOHAIB ABBASI, W. STEVE ALBRECHT, CHARLENE T. BEGLEY, KIMBERLY L. HAMMONDS, WILLIAM S. KAISER, KEVIN M. MURAI, and ALFRED W. ZOLLAR,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMAND |

Plaintiff Charles Orgel ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.       This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Red Hat, Inc. ("Red Hat" or the "Company") against Red Hat and the members of Red Hat's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Red Hat will be acquired by International Business Machines Corporation ("IBM")

through its wholly owned subsidiary Socrates Acquisition Corp. ("Merger Sub") (the "Proposed Transaction").

2.     On October 28, 2018, Red Hat and IBM issued a joint press release announcing they had entered into an Agreement and Plan of Merger dated October 28, 2018 (the "Merger Agreement") to sell Red Hat to IBM.  Under the terms of the Merger Agreement, each Red Hat stockholder will receive $190.00 in cash for each share of Red Hat common stock they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $34.0 billion.

3.     On December 12, 2018, Red Hat filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Red Hat stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by the Company's financial advisors, Guggenheim Securities, LLC ("Guggenheim") and Morgan Stanley & Co. LLC ("Morgan Stanley"); (ii) the background process leading to the Proposed Transaction; and (iii) Guggenheim's potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Red Hat stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

4.     In short, unless remedied, Red Hat's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

- 2 -

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Red Hat.

9.      Defendant Red Hat is a Delaware corporation, with its principal executive offices located at 100 East Davie Street, Raleigh, North Carolina 27601.  The Company is a global provider of open source software solutions to meet the information technology ("IT") needs of enterprises and service providers.  Red Hat's common stock trades on the New York Stock Exchange under the ticker symbol "RHT."

10.     Defendant James M. Whitehurst ("Whitehurst") has been President, Chief Executive Officer ("CEO") and a director of the Company since January 2008.

11.     Defendant Narendra K. Gupta ("Gupta") has been Chairman of the Board since August 2017 and a director of the Company since November 2005.

12.     Defendant Sohaib Abbasi ("Abbasi") has been a director of the Company since March 2011.

13.     Defendant W. Steve Albrecht ("Albrecht") has been a director of the Company since March 2011 and previously served as a director of the Company from April 2003 through June 2009.

14.     Defendant Charlene T. Begley ("Begley") has been a director of the Company since November 2014.

15.     Defendant Kimberly L. Hammonds ("Hammonds") has been a director of the Company since August 2015.

16.     Defendant William S. Kaiser ("Kaiser") has been a director of the Company since September 1998.

17.     Defendant Kevin M. Murai ("Murai") has been a director of the Company since September 2018.

18.     Defendant Alfred W. Zollar ("Zollar") has been a director of the Company since May 2018.

19.     Defendants identified in paragraphs 10-18 are referred to herein as the "Board" or the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Red Hat common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

22.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of December 11, 2018, there were 176,759,752 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Red Hat or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

23.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

        a)      Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

        b)      Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        c)      Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

24.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

26.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

27.     Red Hat was incorporated in Connecticut in March 1993 as ACC Corp., Inc. and subsequently changed its name to Red Hat Software, Inc.  In September 1998, Red Hat Software Inc. reincorporated in Delaware and in June 1999, changed its name to Red Hat, Inc.  The Company is a leading global provider of open source software solutions, using a community-powered approach to develop and offer reliable and high-performing operating system, virtualization, management, middleware, cloud, mobile and storage technologies.

28.     The Company's offerings are related to infrastructure, application development, and other emerging technologies.  Red Hat also offers consulting services to assist customers in the application, development and integration of middleware, cloud, mobile and storage solutions, as well as support services to implement and configure Red Hat's technologies.

29.     Red Hat's business strategy includes pursuing selective acquisitions in order to complement and expand the Company's technology offerings and service capabilities.  For example, on January 30, 2018, Red Hat announced it had entered into an agreement to acquire CoreOS, Inc. ("CoreOS") for $250 million.  According to the press release announcing the acquisition, the acquisition will:

> further [Red Hat's] vision of enabling customers to build any application and deploy them in any environment with the flexibility afforded by open source. By combining CoreOS's complementary capabilities with Red Hat's already broad Kubernetes and container-based portfolio, including Red Hat OpenShift, Red Hat aims to further accelerate adoption and development of the industry's leading hybrid cloud platform for modern application workloads.

- 6 -

30.     On June 21, 2018, Red Hat reported strong first quarter of fiscal year 2019 financial results.  Total revenue for the quarter was $814 million, a 20% increase compared to the first quarter of fiscal year 2018.  GAAP net income was $113 million, or $0.59 diluted earnings per share, compared to GAAP net income of $75 million, or $0.41 diluted earnings per share in the first quarter of fiscal year 2018.  Eric Shander ("Shander"), Executive Vice President and Chief Financial Officer of Red Hat, summarized the financial highlights for the quarter, stating:

> The first quarter of FY19 started as expected with double digit year-over-year growth across a number of our financial metrics, including 20% total revenue growth in U.S. dollars or 17% measured in constant currency, 25% growth in GAAP operating income, 19% growth in non-GAAP operating income, and 34% growth in operating cash flow.  In addition, we also drove 48% year-over-year growth in the number of deals over one million dollars in the quarter which is evidence of our ability to expand our technology footprint with customers. . . .

31.     On September 19, 2018, the Company announced its second quarter of fiscal year 2019 financial results.  For the quarter, total revenue was $823 million, a 14% increase compared to the second quarter of fiscal year 2018.  Subscription revenue was $723 million, a 13% increase compared to the second quarter of fiscal year 2018.  Non-GAAP operating income for the quarter was $197 million, a 3% increase compared to the second quarter of fiscal year 2018. Defendant Whitehurst commented on the quarter's successful financial results, stating, "The expansion of our technology portfolio has increased our strategic importance with customers, which is evidenced by the number of deals over five million dollars in the second quarter more than doubling year-over-year."   Additionally, Shander was quoted as stating, "Our second quarter results were consistent with our guidance and we drove 20% growth in total backlog to $3.3 billion. . . ."

**The Sale Process**

32.     Between October and December 2017, Guggenheim met with representatives of IBM, on Red Hat's behalf, to discuss Red Hat, including regarding a potential commercial partnership and other strategic alternatives.

33.     Also during this time period, members of Red Hat senior management met with IBM representatives to discuss expanding the commercial partnership between the two parties, which Red Hat and IBM subsequently announced on May 8, 2018.

34.     In March 2018, defendant Whitehurst met the CEO of a technology company referred to in the Proxy Statement as "Party A," who indicated Party A's possible interest in an acquisition of Red Hat.  Over the next few months, defendant Whitehurst and Paul Cormier ("Cormier"), Executive Vice President and President, Products and Technologies, of Red Hat, periodically held discussions with Party A regarding a potential transaction.

35.     During the spring of 2018, Cormier met with representatives of a technology company referred to in the Proxy Statement as "Party B" to discuss a potential commercial partnership in the software industry.

36.     On September 23, 2018, Guggenheim met with a senior executive of IBM to discuss IBM's interest in potentially pursuing a strategic transaction with the Company.

37.     On September 27, 2018, IBM offered to acquire 100% of the equity securities of Red Hat for $185.00 per share in cash, with the goal of retaining substantially all of Red Hat's management team.

38.     On October 5, 2018, Cormier met with representatives of Party B.  One of the senior executives of Party B requested that Red Hat notify Party B if Red Hat was to ever explore other strategic opportunities.  Two days later, on October 7, 2018, a member of the board

of Party B contacted Guggenheim to determine whether Red Hat had established a formal sale process and requested that Red Hat afford Party B sufficient time to assess its interest in pursuing a strategic transaction with Red Hat.

39.     At an October 12, 2018 Board meeting, the Board instructed defendant Whitehurst to contact a technology company referred to in the Proxy Statement as "Party C" regarding its interest in a potential strategic transaction.  Defendant Whitehurst contacted Party C later that day.

40.     On October 17 and October 19, 2018, Red Hat executed a confidentiality agreement with each of Party B and Party C, respectively.

41.     Also on October 19, 2018, Ginni Rometty, Chairman, CEO and President of IBM, submitted a revised proposal to acquire Red Hat for $190.00 per share in cash.  IBM also provided a draft exclusivity agreement, which provided for an exclusivity period through November 2, 2018.

42.     Red Hat and IBM executed the exclusivity agreement on October 21, 2018, which provided for exclusivity through 7:30 a.m. on October 29, 2018.

43.     Over the next few days, IBM and Company representatives negotiated the terms of the Merger Agreement and retention agreements for Red Hat executive officers.

44.     At an October 28, 2018 Board meeting, Guggenheim and Morgan Stanley rendered their fairness opinions and the Board approved the Merger Agreement.  Red Hat and IBM subsequently executed the Merger Agreement.

**The Proposed Transaction**

45.     On October 28, 2018, Red Hat and IBM issued a joint press release announcing the Proposed Transaction, which states, in relevant part:

IBM (NYSE:IBM) and Red Hat (NYSE:RHT), the world's leading provider of open source cloud software, announced today that the companies have reached a definitive agreement under which IBM will acquire all of the issued and outstanding common shares of Red Hat for $190.00 per share in cash, representing a total enterprise value of approximately $34 billion.

"The acquisition of Red Hat is a game-changer. It changes everything about the cloud market," said Ginni Rometty, IBM Chairman, President and Chief Executive Officer. "IBM will become the world's #1 hybrid cloud provider, offering companies the only open cloud solution that will unlock the full value of the cloud for their businesses.

"Most companies today are only 20 percent along their cloud journey, renting compute power to cut costs," she said. "The next 80 percent is about unlocking real business value and driving growth. This is the next chapter of the cloud. It requires shifting business applications to hybrid cloud, extracting more data and optimizing every part of the business, from supply chains to sales."

"Open source is the default choice for modern IT solutions, and I'm incredibly proud of the role Red Hat has played in making that a reality in the enterprise," said Jim Whitehurst, President and CEO, Red Hat. "Joining forces with IBM will provide us with a greater level of scale, resources and capabilities to accelerate the impact of open source as the basis for digital transformation and bring Red Hat to an even wider audience – all while preserving our unique culture and unwavering commitment to open source innovation."

This acquisition brings together the best-in-class hybrid cloud providers and will enable companies to securely move all business applications to the cloud. Companies today are already using multiple clouds. However, research shows that 80 percent of business workloads have yet to move to the cloud, held back by the proprietary nature of today's cloud market. This prevents portability of data and applications across multiple clouds, data security in a multi-cloud environment and consistent cloud management.

IBM and Red Hat will be strongly positioned to address this issue and accelerate hybrid multi-cloud adoption. Together, they will help clients create cloud-native business applications faster, drive greater portability and security of data and applications across multiple public and private clouds, all with consistent cloud management. In doing so, they will draw on their shared leadership in key technologies, such as Linux, containers, Kubernetes, multi-cloud management, and cloud management and automation.

IBM's and Red Hat's partnership has spanned 20 years, with IBM serving as an early supporter of Linux, collaborating with Red Hat to help develop and grow enterprise-grade Linux and more recently to bring enterprise Kubernetes and hybrid cloud solutions to customers. These innovations have become core

technologies within IBM's $19 billion hybrid cloud business. Between them, IBM and Red Hat have contributed more to the open source community than any other organization.

"Today's announcement is the evolution of our long-standing partnership," said Rometty. "This includes our joint Hybrid Cloud collaboration announcement in May, a key precursor in our journey to this day."

With this acquisition, IBM will remain committed to Red Hat's open governance, open source contributions, participation in the open source community and development model, and fostering its widespread developer ecosystem. In addition, IBM and Red Hat will remain committed to the continued freedom of open source, via such efforts as Patent Promise, GPL Cooperation Commitment, the Open Invention Network and the LOT Network.

IBM and Red Hat also will continue to build and enhance Red Hat partnerships, including those with major cloud providers, such as Amazon Web Services, Microsoft Azure, Google Cloud, Alibaba and more, in addition to the IBM Cloud. At the same time, Red Hat will benefit from IBM's hybrid cloud and enterprise IT scale in helping expand their open source technology portfolio to businesses globally.

"IBM is committed to being an authentic multi-cloud provider, and we will prioritize the use of Red Hat technology across multiple clouds" said Arvind Krishna, Senior Vice President, IBM Hybrid Cloud. "In doing so, IBM will support open source technology wherever it runs, allowing it to scale significantly within commercial settings around the world."

Upon closing of the acquisition, Red Hat will join IBM's Hybrid Cloud team as a distinct unit, preserving the independence and neutrality of Red Hat's open source development heritage and commitment, current product portfolio and go-to-market strategy, and unique development culture. Red Hat will continue to be led by Jim Whitehurst and Red Hat's current management team. Jim Whitehurst also will join IBM's senior management team and report to Ginni Rometty. IBM intends to maintain Red Hat's headquarters, facilities, brands and practices.

"IBM's commitment to keeping the things that have made Red Hat successful - always thinking about the customer and the open source community first – make this a tremendous opportunity for not only Red Hat but also open source more broadly," said Paul Cormier, President, Products and Technologies, Red Hat. "Since the day we decided to bring open source to the enterprise, our mission has remained unchanged. And now, one of the biggest enterprise technology companies on the planet has agreed to partner with us to scale and accelerate our efforts, bringing open source innovation to an even greater swath of the enterprise."

- 11 -

**Financial Details**

The acquisition of Red Hat reinforces IBM's high-value model. It will accelerate IBM's revenue growth, gross margin and free cash flow within 12 months of closing. It also will support a solid and growing dividend.

The company will continue with a disciplined financial policy and is committed to maintaining strong investment grade credit ratings. The company will target a leverage profile consistent with a mid to high single A credit rating. The company intends to suspend its share repurchase program in 2020 and 2021.

At signing, the company has ample cash, credit and bridge lines to secure the transaction financing. The company intends to close the transaction through a combination of cash and debt.

The acquisition has been approved by the boards of directors of both IBM and Red Hat. It is subject to Red Hat shareholder approval. It also is subject to regulatory approvals and other customary closing conditions. It is expected to close in the latter half of 2019.

**Insiders' Interests in the Proposed Transaction**

46.     Red Hat and IBM insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Red Hat.

47.     Notably, certain Red Hat insiders have secured employment for themselves upon consummation of the Proposed Transaction.  For example, the Proxy Statement sets forth:

> In connection with the execution of the merger agreement, certain of our executive officers (Ms. Alexander and Messrs. Cormier, Oberoi and Whitehurst) have entered into new retention arrangements with IBM which are conditional upon the closing of the merger. The retention arrangements generally provide that each executive will participate in a retention program following the closing and further provide that each executive's base salary and target cash incentive bonus will continue in effect following the closing during the period of the retention program. The retention program generally provides each executive with cash retention payments if the executive remains employed for a specified period after the closing (three years for Ms. Alexander and Mr. Whitehurst, two years for Messrs. Cormier and Oberoi), and in the case of Mr. Whitehurst, subject to the achievement of performance milestones to be determined by Mr. Whitehurst and

IBM. The retention payments are payable in installments with respect to a series of retention periods within the overall retention period. The aggregate individual retention bonuses are $8,500,000 for Mr. Cormier, $6,000,000 for Messrs. Oberoi and Whitehurst and $3,000,000 for Ms. Alexander. . . . In addition, Mr. Whitehurst's retention arrangement provides that he will receive a new award of IBM restricted stock units with a grant date fair value as of the closing equal to $15,000,000.

Proxy Statement at 77.  The Proxy Statement further sets forth that "each of Red Hat and IBM will establish special bonus programs to assist in retaining key employees in the period through and after the merger." *Id*.

48.    Moreover, Red Hat's directors and executive officers stand to reap substantial financial benefits for securing the deal with IBM.  Pursuant to the Merger Agreement, all cash-out restricted shares, restricted stock units and performance share units will vest and convert into the right to receive cash payments.  The following table sets forth the estimated amounts that each of the Company's directors and executive officers will receive in connection with their cash-out equity awards:

**Equity and Equity Compensation Held by Non-Employee Directors and Executive Officers (as of December 7, 2018)**

| | Shares (#) | Value of Shares ($) | Performance Share Units[1] (#) | Value of Performance Share Units ($) | Restricted Stock Units/ Restricted Shares[2] (#) | Value of Restricted Stock Units/ Restricted Shares ($) | Total Value ($) |
|---|---|---|---|---|---|---|---|
| **Board of Directors** | | | | | | | |
| Narendra K. Gupta, Board Chair | 7,345 | 1,395,550 | — | — | 46,284[3] | 8,793,960 | 10,189,510 |
| Sohaib Abbasi | 8,045 | 1,528,550 | — | — | 31,671[4] | 6,017,490 | 7,546,040 |
| W. Steve Albrecht | 15,644 | 2,972,360 | — | — | 15,392[5] | 2,924,480 | 5,896,840 |
| Charlene T. Begley | 8,144 | 1,547,360 | — | — | 1,710 | 324,900 | 1,872,260 |
| Kimberly L. Hammonds | 9,551 | 1,814,690 | — | — | 1,710 | 324,900 | 2,139,590 |
| William S. Kaiser | 61,652 | 11,713,880 | — | — | 8,900[6] | 1,691,000 | 13,404,880 |
| Kevin M. Murai | — | — | — | — | 2,429[7] | 461,510 | 461,510 |
| Alfred W. Zollar | — | — | — | — | 2,337[8] | 444,030 | 444,030 |
| **Named Executive Officers** | | | | | | | |
| James M. Whitehurst | 287,856 | 54,692,640 | 293,646 | 55,792,740 | 71,258 | 13,539,020 | 124,024,400 |
| Eric R. Shander | 5,711 | 1,085,090 | 46,773 | 8,886,870 | 21,106 | 4,010,140 | 13,982,100 |
| Paul J. Cormier | 160,955 | 30,581,450 | 144,315 | 27,419,850 | 34,656 | 6,584,640 | 64,585,940 |
| Arun Oberoi | 86,274 | 16,392,060 | 145,158 | 27,580,020 | 30,830 | 5,857,700 | 49,829,780 |
| Michael R. Cunningham | 33,100 | 6,289,000 | 72,861 | 13,843,590 | 17,538 | 3,332,220 | 23,464,810 |
| **Other Executive Officers** | | | | | | | |
| DeLisa K. Alexander | 15,000 | 2,850,000 | 71,493 | 13,583,670 | 17,257 | 3,278,830 | 19,712,500 |
| Michael A. Kelly | — | — | 18,906 | 3,592,140 | 14,801 | 2,812,190 | 6,404,330 |

49.    The Proxy Statement further sets forth that the Company "may grant equity awards in the form of restricted share awards, restricted stock units or DSUs prior to the merger

in the ordinary course of business consistent with past practice, up to an aggregate grant date fair value of $350 million per year" and that "any such awards will provide for accelerated vesting in the event of qualifying terminations of employment during the one-year period immediately following the merger." *Id*.

50.     Finally, if they are terminated in connection with the Proposed Transaction, the Company's executive officers will receive substantial cash severance payments, as set forth in the following tables:

| Officer | Cash[1] ($) | Equity[2] ($) | Perquisites/ Benefits[3] ($) | Tax Reimbursement[4] ($) | Total ($) |
|---|---|---|---|---|---|
| James M. Whitehurst | 6,770,274 | 69,331,760 | 109,763 | — | 76,211,797 |
| Eric R. Shander | 2,364,370 | 12,897,010 | 44,163 | N/A | 15,305,543 |
| Paul J. Cormier | 3,587,451 | 34,004,490 | 33,133 | — | 37,625,074 |
| Arun Oberoi | 2,840,415 | 33,437,720 | 44,163 | N/A | 36,322,298 |
| Michael R. Cunningham | 2,219,705 | 17,175,810 | 44,163 | — | 19,439,678 |

| Officer | Cash[1] ($) | Equity[2] ($) | Perquisites/ Benefits[3] ($) | Tax Reimbursement[4] ($) | Total ($) |
|---|---|---|---|---|---|
| DeLisa K. Alexander | 2,162,308 | 16,862,500 | 44,163 | — | 19,068,971 |
| Michael A. Kelly | 1,646,626 | 6,404,330 | 44,163 | N/A | 8,095,119 |

## The Proxy Statement Contains Material Misstatements and Omissions

51.     The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Red Hat's stockholders.  The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction or seek appraisal.

52.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by the Company's financial advisors, Guggenheim and Morgan Stanley; (ii) the background process leading to the Proposed Transaction; and (iii) Guggenheim's

potential conflicts of interest.  Accordingly, Red Hat stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Guggenheim's and Morgan Stanley's Financial Analyses***

53.    The Proxy Statement describes Guggenheim's and Morgan Stanley's fairness opinions and the various valuation analyses performed in support of their opinions.  However, the description of Guggenheim's and Morgan Stanley's fairness opinions and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Red Hat's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Guggenheim's and Morgan Stanley's fairness opinions in determining whether to vote in favor of the Proposed Transaction or seek appraisal.  This omitted information, if disclosed, would significantly alter the total mix of information available to Red Hat's stockholders.

54.    With respect to Guggenheim's *Red Hat Discounted Cash Flow Analyses* ("DCF"), the Proxy Statement fails to disclose: (i) Red Hat's terminal year normalized after-tax unlevered free cash flow ("UFCF"), utilized by Guggenheim in the analysis; (ii) Red Hat's implied terminal year EBITDA (post-stock-based compensation); (iii) the line items Guggenheim used to calculate UFCFs for each of the base case forecast, the risk forecast and the outperform forecast, including net working capital, stock-based compensation, capital expenditures, acquisition related expenditures and cash taxes; and (iv) quantification of the inputs and assumptions underlying the discount rate range of 9.25% to 11.00%.

55.    With respect to Morgan Stanley's *DCF*, the Proxy Statement fails to disclose: (i) the amount of net operating losses and other tax shield benefits that Red Hat management

projected would accrue and/or be utilized for the period from fiscal year 2019 through fiscal year 2034; (ii) the line items Morgan Stanley used to calculate UFCFs for each of the base case forecast, the risk forecast and the outperform forecast, including stock-based compensation, taxes at the effective tax rate, capital expenditures, capital expenditures for acquisitions and changes in net working capital; and (iii) quantification of the inputs and assumptions underlying the discount rates ranging from 9.5% to 10.5%.

56.     With respect to Guggenheim's *Red Hat Selected Publicly-Traded Companies Analysis*, the Proxy Statement fails to disclose Red Hat's levered free cash flow (pre-stock-based compensation) for fiscal year 2020.

57.     With respect to Morgan Stanley's *Public Trading Comparables Analysis*, the Proxy Statement fails to disclose Red Hat's street case revenue and UFCF for calendar years 2019 and 2020.

58.     With respect to Morgan Stanley's *Precedent Transactions Analysis*, the Proxy Statement fails to disclose: (i) the individual multiples and financial metrics for each of the transactions analyzed by Morgan Stanley in the analysis; and (ii) the street case projections for Red Hat's UFCF and revenue for the 12-month period following the announcement date.

59.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

60.     The omission of this information renders the statements in the "Opinion of Red Hat's Financial Advisors" and "Financial Forecast" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

61.    The Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

62.    In connection with the sale process, Red Hat executed confidentiality agreements with each of Party B and Party C.  The Proxy Statement fails, however, to disclose whether Red Hat similarly executed a confidentiality agreement with Party A.  The Proxy Statement further fails to disclose whether any of the confidentiality agreements Red Hat entered into with Party B, Party C and, to the extent applicable, Party A, contain standstill provisions that are still in effect and/or contain "don't ask, don't waive" standstill provisions that are presently precluding these parties from submitting a topping bid for the Company.

63.    The disclosure of the existence and terms of any confidentiality agreements Red Hat entered into with any other party is crucial to Red Hat stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

64.    The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Guggenheim's Potential Conflicts of Interest***

65.    The Proxy Statement fails to disclose material information concerning potential conflicts of interest faced by one of the Company's financial advisors, Guggenheim.

66.    The Proxy Statement sets forth:

During the two years prior to the rendering of its opinion, Guggenheim Securities had previously been engaged by each of Red Hat and IBM to provide financial advisory or investment banking services in connection with matters unrelated to the merger, for which Guggenheim Securities received compensation.

> Specifically, during the past two years Guggenheim Securities was engaged as a consultant to Red Hat with respect to various strategic and financial alternatives and received agreed upon fees (including, among other matters, in respect of Red Hat's acquisition of CoreOS, Inc. in 2018). In addition, Guggenheim Securities acted as financial advisor to IBM in connection with its acquisition of Promontory Financial Group, LLC, which closed in November 2016 and for which Guggenheim Securities received an agreed upon fee. Guggenheim Securities may seek to provide Red Hat, IBM and their respective affiliates with certain financial advisory and investment banking services unrelated to the merger in the future, for which services Guggenheim Securities would expect to receive compensation.

*Id.* at 59-60.  Yet, the Proxy Statement fails to disclose the "agreed upon fees" Guggenheim received in connection with the prior services it performed for both Red Hat and IBM in the two years prior to the signing of the Merger Agreement.

67.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

68.     The omission of this information renders the statements in the "Opinion of Red Hat's Financial Advisors" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

69.     The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

70.     Plaintiff repeats all previous allegations as if set forth in full.

71.     During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

72.     By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by the Company's financial advisors, the background process leading to the Proposed Transaction, and Guggenheim's potential conflicts of interest.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

73.     The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or whether to seek to exercise their appraisal rights.

74.     By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

75.     Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

76.     Plaintiff repeats all previous allegations as if set forth in full.

77.     The Individual Defendants acted as controlling persons of Red Hat within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Red Hat, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy Statement.

80.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

81.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

82.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' conduct, Red Hat's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Red Hat, and against defendants, as follows:

A.     Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Red Hat stockholders;

C.      In the event defendants consummate the Proposed Transaction, rescinding it and

setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange

Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.      Awarding Plaintiff the costs of this action, including reasonable allowance for

Plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  December 18, 2018                              **O'KELLY ERNST & JOYCE, LLC**

                                                      By   */s/ Ryan M. Ernst*
                                                           Ryan M. Ernst (#4788)
                                                           901 N. Market St., Suite 1000
                                                           Wilmington, DE 19801
                                                           Tel.: (302) 778-4000
                                                           Email: rernst@oelegal.com

**OF COUNSEL:**

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly K. Moran
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*